UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CDS BUSINESS SERVICES, INC., *doing business as* NEWTEK BUSINESS CREDIT,

                              Plaintiff,

     -against-

H.M.C., INC, and KARA DiPIETRO,

                            Defendants.
------------------------------------------------------------x

**REPORT AND RECOMMENDATION**
19-CV-5759 (SJF)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court in this diversity-breach of contract action, on referral from the Honorable Sandra J. Feuerstein for report and recommendation, is Plaintiff CDS Business Services, Inc.'s ("Plaintiff" or "CDS") Motion for Summary Judgment ("Plaintiff's Motion" or "Pl. Mot."), DE [29], pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). By way of Complaint dated October 11, 2019, Plaintiff commenced this action against Defendants H.M.C., Inc. ("HMC") and Kara DiPietro ("DiPietro") (collectively, "Defendants"), alleging that Defendants breached the parties' contract and tortiously interfered with contractual relations between CDS and Defendants' customers. *See* Complaint ("Compl."), Docket Entry ("DE") [1]. For the reasons set forth herein, the Court respectfully recommends that Plaintiff's Motion be granted.[1]

---

[1] For the sake of clarity, the Court notes that Plaintiff's Motion is directed only as to liability, not damages.

## I.    BACKGROUND

The following facts are taken from the parties' pleadings, declarations, exhibits and respective Local Rule 56.1 statements.  Except where indicated, these facts are not in dispute.

Plaintiff CDS is a Delaware corporation with its principal place of business in Lake Success, New York, and "has provided receivables financing, inventory financing, health care receivables financing, and management services to small- to medium-size businesses for over 10 years."  Compl. ¶¶ 2, 9.  Defendant DiPietro is the citizen of Maryland, and the President of Defendant HMC, a Maryland corporation with its principal place of business in Columbia, Maryland.  *Id.* at ¶¶ 3-4, 12.  HMC is a "custom architectural millwork company, serving primarily the foodservice industry, that ha[s] been in business since 1989."  *Id.* at ¶ 10; Defendants' Answer to Complaint ("Ans."), DE [8], ¶ 10.  In the three years preceding the events detailed herein, "HMC's annual total sales…averaged over $10 million per year."  *Id.*

### A.  <u>Initial Relationship Between HMC, CDS, and DiPietro</u>

According to Defendants, in March 2018, "HMC was approached by a broker, Commercial Finance Partners ("CFP"), about obtaining a small business loan through CDS to improve [HMC's] cash flow and on March 15, 2018, HMC applied for the loan."  *See* Defendants' Response to Plaintiff's Statement of Material Facts In Support of Motion for Summary Judgment and Counterstatement/Statement of Additional Facts ("Def. 56.1"), DE [30-1], ¶ 85.  CFP was allegedly "a referral partner for CDS and, in addition to fees paid directly by HMC, CFP [allegedly] received a commission for each

transaction that it referred to CDS." *Id.* at ¶ 86. A few weeks after first contact, "CFP approached HMC about obtaining a line of credit through CDS." ¶ 87. Between March and June 2018, HMC "responded to virtually daily questions [from] CFP and CDS's underwriters concerning [HMC's] clients, sales, prior financing arrangements, inventory and other assets, and requests for documents including receivable reports, proof of insurance and valuations." *Id.* at ¶ 89. On or about June 4, 2018, "HMC received a letter (the "Approval Letter") from CDS advising that HMC been approved for a "$1,000,000 Accounts Receivable Line of Credit" pursuant to which Plaintiff agreed to "advance funds up to 80% of the face value of eligible commercial accounts receivable associated with eligible customers of [HMC] not to exceed [$1,000,000] in the aggregate." *Id.* at ¶ 90; *see also* December 23, 2020 Deposition of Kara DiPietro (attached as Exhibit 3 to the Declaration of Kara DiPietro ("DiPietro Decl."), DE [30-3]).

**B. The Parties Enter Into the Agreement and Guaranty**

On or about June 28, 2018, HMC and CDS entered into an Accounts Receivable Agreement (the "Agreement"), whereby Plaintiff agreed to provide HMC with up to $1,000,000 in financing secured by HMC's accounts receivable. *See* Plaintiff's Statement of Uncontroverted Material Facts In Support of Motion for Summary Judgment ("Pl. 56.1"), DE [29-1], ¶ 1; Def. 56.1 ¶ 1; Compl. Ex. 1 (copy of the Agreement, signed by DiPietro as HMC's President, and CDS's President). That same day, DiPietro executed a personal guaranty (the "Guaranty") in favor of CDS,

wherein she guaranteed to Plaintiff all of HMC's obligations under the Agreement. Pl. 56.1 ¶ 2; Compl. Ex. 2 (copy of the Guaranty, signed by DiPietro).

### C. <u>Material Terms of the Agreement</u>

The Agreement sets forth the terms and conditions, pursuant to which Plaintiff agreed to provide HMC with a revolving line of credit of up to $1,000,000, secured by a subset of HMC's accounts receivable. Pl. 56.1 ¶ 6; Agreement §§ 1.1, 2.1. Under the Agreement, HMC "agreed to assign to CDS the accounts receivable – i.e., open invoices owed to HMC by HMC's customers – that [Plaintiff], in its sole discretion, determined to be 'Approved Accounts Receivable.'" Pl. 56.1 ¶ 7; Agreement §§ 1.1, 2.1. "HMC could then request, and CDS is its sole discretion could make, advance payments to HMC of up to 80% of the aggregate outstanding amount of the open invoices that HMC had assigned to [Plaintiff]." *Id.* In order to secure HMC's obligations under the Agreement, HMC "granted CDS a continuing first-priority lien and security interest in all of HMC's current and future accounts receivable and certain other assets." Pl. 56.1 ¶ 8; Agreement § 4.1. Plaintiff perfected its security interest in HMC's accounts receivable and other assets by filing a UCC-1 Financing Statement with the Maryland Department of Assessments & Taxation. Pl. 56.1 ¶ 9.

### i. <u>HMC Assigns its Accounts Receivable to CDS</u>

Pursuant to the Agreement, HMC was required to notify the customers whose accounts receivable had been purchased by, and assigned to, Plaintiff that those customers were to "pay their invoices directly – and only – to CDS." Pl. 56.1 ¶ 10.

For example, the Agreement required that HMC's invoices to its customers include the following language:

> **THIS ACCOUNT RECEIVABLE IS SOLD AND ASSIGNED TO, IS OWNED BY AND IS PAYABLE ONLY TO CDS BUSINESS SERVICES, INC d/b/a NEWTEK BUSINESS CREDIT P.O. BOX 3611, NEW HYDE PARK, NY 11040, TO WHOM PROMPT NOTICE MUST BE GIVE[N] FOR ANY OBJECTIONS TO PAYMENT OF THIS INVOICE AS RENDERED. GOODS RETURNABLE FOR ANY REASON SHALL BE RETURNABLE ONLY UPON NOTICE TO NEWTEK BUSINESS CREDIT.**

*See id*; *see also* Agreement §§ 2.1, 2.4 (emphasis in original).  In accordance with the Agreement, Plaintiff and HMC provided an "Assignment Notice" to each HMC customer whose receivables were deemed by CDS to be "Approved Accounts Receivable," that each such customer "w[as] to remit payment only to CDS."  Pl. 56.1 ¶ 11; Agreement § 2.1.  The Assignment Notices were executed by Plaintiff and HMC on HMC's letterhead, sent to designated HMC customers during the July-September 2018 time period, and instructed each recipient "to pay the full amount of all existing and future invoices from HMC" to CDS, because HMC had "sold and assigned these invoices to [CDS] and, and as such they are now owned by [CDS]."  Pl. 56.1 ¶¶ 12-13, 15.  Each Assignment Notice contained the following language:

> This assignment and the payment instructions are effective as of [the date of this letter] and cannot be modified or revoked except in writing, executed by [CDS] and delivered to you. For proper credit to your account with HMC, payments on all HMC invoices should not be made to any other party other than [CDS] without the prior written consent of [CDS].

5

*Id.* at ¶ 14.  If, notwithstanding an Assignment Notice's payment instructions, a recipient-customer paid an invoice directly to HMC, HMC was required under the Agreement to deliver the payment to Plaintiff in the "original form as received" within three business days and that the failure to do so was an Event of Default under the Agreement.  *Id.* at ¶ 16; Agreement § 2.4.

### ii.  **HMC Charged Interest of Prime Rate Plus 5%**

Under the Agreement, HMC agreed to pay CDS:  (a) interest; (b) a monthly collateral monitoring fee; and (c) an administrative processing fee.  *See generally* Agreement.  According to the text of the Agreement, the interest rate on HMC's outstanding balance was to accrue at a per annum rate of 5% above the prime rate[2] on a daily basis until all of HMC's obligations were paid in full.  *See* Pl. 56.1 ¶ 18; Agreement §§ 1.1, 2.3(A).  Plaintiff charged HMC interest once per month, "on the first day of the month for the previous calendar month."  *Id.* at ¶ 20.  If HMC were to default on the Agreement, "default interest [would] accrue at the per annum rate of 10% above [the prime rate]."  *Id.* at ¶ 18; Agreement §§ 1.1, 2.3(A).  On the date the parties entered into the Agreement, the prime rate was 5%.  *See* Pl. 56.1 ¶ 19.  The prime rate rose to 5.25% on September 27, 2018, to 5.5% on December 20, 2018, and, as of November 2020, had decreased to approximately 3.25%.  *See id.*

---

[2] According to the Agreement, the "prime rate" is "the daily rate of interest published as the prime rate of interest in the Wall Street Journal (as reflected on the website www.bankrate.com), or any successor thereof, from time to time as its prime rate, which shall not necessarily constitute the lowest available prime rate." Agreement § 1.1.

### iii. <u>The Collateral Monitoring Fee</u>

Through the Agreement, CDS "required HMC to pay a monthly collateral monitoring fee equal to 0.7% of [HMC's] average outstanding balance for the prior thirty days (the "Collateral Monitoring Fee")." *Id.* at ¶ 21. According to Plaintiff, this fee was intended to reimburse CDS for "internal and external costs borne by [Plaintiff] such as processing and verifying accounts receivable invoices, determining the creditworthiness of HMC's customers, reviewing and processing HMC's assignment agreements with its customers, monitoring and tracking assigned invoices, sending notifications to HMC that invoices were approaching the maximum age to qualify for borrowing eligibility, and processing and applying payments to verify that payments were applied correctly to outstanding customer invoices and the outstanding balances." *Id.* at ¶ 22. HMC disagrees, however, and contends that, during his deposition, Paul Borowski – Plaintiff's corporate designee – testified that the Collateral Monitoring Fee "varied from customer to customer and was not something set to cover CDS's expenses," but was actually "something agreed upon at that particular point of the agreement, and the dollar amount." *See* Def. 56.1 ¶ 22; October 21, 2020 Deposition of Paul Borowski ("Borowski Dep.") (attached as Exhibit 2 to the Declaration of Shane Heskin ("Heskin Decl."), DE [30-2]), at 45:8-10. Plaintiff charged HMC the Collateral Monitoring Fee monthly, "on the first day of the month for the previous calendar month," and calculated each month's fee "by multiplying HMC's average daily outstanding balance over the course of the calendar month being evaluated by 0.7% (0.007)." *See* Pl. 56.1 ¶ 24.

7

### iv.  **The Administrative Processing Fee**

The parties also agreed that, "in the event that one of HMC's customers paid an invoice directly to HMC, but HMC failed to remit such payment to [Plaintiff] within three business days, HMC was required to pay an administrative processing fee (the "Administrative Processing Fee") equal to 15% of the payment that was withheld by HMC." *Id.* at ¶ 25; *see also* Agreement § 2.4.  The parties disagree regarding the Administrative Processing Fee's purpose and basis of calculation.  CDS avers that it is a one-time fee calculated "as a percentage of any payment that HMC receives from its customer but fails to remit to CDS," and "is ***not*** calculated based on the loan balance or the amount of money advanced to HMC under the [Agreement]." Pl. 56.1 ¶ 26 (emphasis in original).  HMC counters that, under the Agreement, Plaintiff was not permitted "to maintain the proceeds of Accounts Receivable absent a loan balance," and that "the absence of such a right tied the Administrative Fee to the loan balance." Def. 56.1 ¶ 26.  Upon execution of the Agreement, Plaintiff also charged HMC a $10,000 closing fee, and HMC agreed to "reimburse CDS for certain out-of-pocket expenses." Pl. 56.1 ¶¶ 28-29; Agreement §§ 1.1, 2.8, 6.8.

### v.  **HMC's Payment Obligations Under the Agreement**

The Agreement defined "Obligations" as "all [advance payments], extensions of credit, loans, debts, liabilities (including all interest and amounts charged to the Obligations pursuant to any agreement authorizing [CDS] to char[g]e the Obligations), obligations, lease payments, guaranties, covenants, and duties owing by [HMC] to [CDS]...." Pl. 56.1 ¶ 30; Agreement § 1.1.  The parties do not dispute that

HMC's failure to pay any portion of the Obligations constituted an "Event of Default" under the Agreement and that CDS was permitted, "at its election, without notice of such election and without demand," to "[d]eclare all Obligations...immediately due and payable in full." Pl. 56.1 ¶¶ 31-32; Agreement §§ 8.1, 9.1.

### D. Material Terms of the Guaranty

Under the Guaranty, DiPietro "unconditionally and irrevocably guarantee[d] to [CDS] the prompt payment and performance of the Guaranty's Guaranteed Obligations[3] whether or not the Guaranteed Obligations were found to be invalid, illegal, or unenforceable, and "agree[d] to reimburse [CDS] on demand for the actual costs of enforcing its rights under this Agreement, including…Attorneys' fees which [CDS] has incurred or may incur in enforcing this Agreement…." Pl. 56.1 ¶¶ 33, 36; Guaranty §§ 2.1, 10.1, 10.1.1. While the parties agree that, under the Guaranty DiPietro "waived certain defenses to her guaranty of payment, including '[a]ny claim of usury,'" *see* Pl. 56.1 ¶ 35; Guaranty § 6.4, Defendants contend that such a waiver only applies to civil usury, and that, under applicable New York law, the defense of criminal usury cannot be waived. Def. 56.1 ¶ 35 (citing *Mular Equities Partnership v. Jimanez*, No. 17611-2006, 2016 WL 5866674, at *10-11 (N.Y. Sup. Ct. Sept. 1. 2016)). Plaintiff disagrees.

---

[3] Under the Guaranty, "Guaranteed Obligations" are defined as ""all present and future obligation of [HMC] to [CDS], including but not limited to obligations arising out of the [Agreement], including charges that, but for the filing of a petition under the Bankruptcy Code with respect to [HMC] would have accrued on any such obligations, and attorneys' fees." Pl. 56.1 ¶ 34; Guaranty § 1.6.

### E. **CDS's Initial Purchase of HMC's Accounts Receivable**

On July 10, 2018, HMC sent CDS the first set of invoices, with a face value of approximately $1,425,335.01, for potential funding under the Agreement.  Pl. 56.1 ¶ 38; DiPietro Decl. Ex. 13.  During the July 13-20, 2018 time period, Plaintiff approved – and paid – advances to HMC totaling $836,537.82.  Pl. 56.1 ¶ 39; Def. 56.1 ¶ 39.  Throughout July and August 2018, "CDS purchased accounts receivable totaling $2,043,208.43, which amount constituted the collateral against which HMC could request advances under the [Agreement]; during that same time period, HMC requested and received advances totaling $1,543,791.72." Pl. 56.1 ¶¶ 40-50; Borowski Decl. ¶¶ 15-16.

### F. **HMC's Partial Repayment of Outstanding Balance**

Throughout July and August 2018, "HMC directly repaid [Plaintiff] the total amount of $534,800.74 for the advances that CDS had paid to HMC" pursuant to the Agreement.  Pl. 56.1 ¶¶ 51-61.  Further, the parties do not dispute that, between July 2018 and February 2019, "HMC's customers made direct payments to CDS in the total amount of $492,834.03," and that "HMC received…but did not remit to [Plaintiff] at least $553,819.05 in customer payments that were required to be paid to CDS" pursuant to the Agreement.  *Id.* at ¶¶ 62-72.  By letter dated November 2, 2018, "CDS provided HMC [with] notice of default and termination" of the Agreement."  *Id.* at ¶ 77; Borowski Decl. ¶ 19.  By letter dated November 9, 2018, "CDS provided HMC with notice of the payoff amount necessary to fully and finally satisfy HMC's Obligations under the [Agreement].  The total payoff amount as of

November 9, 2018, was $646,496.94, consisting of: (1) an outstanding balance of $630,666.09; (2) administration/legal Fees of $1,000.00; (3) interest of $5,967.28; and (4) Collateral Monitoring Fees of $8,863.57." Pl. 56.1 ¶ 78; Borowski Decl. ¶ 20. Since November 2, 2018, "CDS has collected payments from HMC's customers in the amount of $78,597.84," neither HMC nor DiPietro have made further payments to Plaintiff. Pl. 56.1 ¶ 80; Borowski Decl. ¶ 22. As of October 31, 2020, HMC's unpaid outstanding balance was $1,191,887.97, inclusive of the principal, interest, and fees owed under the Agreement. Pl. 56.1 ¶ 82.

### G. **Procedural History**

CDS commenced this action against Defendants by way of Complaint dated October 11, 2019. *See* Compl. The Complaint – seeking damages, attorneys' fees, and costs – asserts claims, "for breach of contract and tortious interference arising from the Defendants' refusal to pay over $900,000 that they owe to CDS following…efforts to divert to HMC over $500,000 that is owed to CDS by third parties." *See* Compl. ¶ 1.

Defendants filed their Answer to the Complaint on November 14, 2019, *see* Ans., after which discovery commenced. On January 14, 2021, after the completion of discovery, CDS filed its motion for summary judgment. *See* Pl. Mot. On January 14, 2021, Judge Feuerstein referred Plaintiff's Motion to this Court for report and recommendation. For the reasons set forth below, the Court respectfully recommends that Plaintiff's Motion be granted.

## II.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the burden of establishing that there are no issues of material fact such that summary judgment is appropriate.  *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004).  In deciding a motion for summary judgment, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986) (holding that a motion for summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the movant has met its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986) (internal quotation omitted); *see also Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 542 (E.D.N.Y. 2014) ("An issue of fact is considered

'genuine' when a reasonable finder of fact could render a verdict in favor of the non-moving party").

In determining whether summary judgment is warranted, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986); *see also Artis v. Valls*, No. 9:10-cv-427, 2012 WL 4380921, at *6, n. 10 (N.D.N.Y. Sept. 25, 2012) ("It is well established that issues of credibility are almost never to be resolved by a court on a motion for summary judgment").

## III.   DISCUSSION

Plaintiff's argument in favor of summary judgment is threefold:  (a) HMC breached the Agreement when it received from its customers – but failed to remit to CDS – over $500,000 in principal, while also refusing to pay additional fees and charges that HMC allegedly owed Plaintiff under the Agreement, *see* Pl. Mem. at 1; (b) DiPietro breached the Guaranty when she failed to make payment on HMC's behalf after it defaulted under the Agreement, *see id.* at 9-11; and (c) Defendants' failure to deliver payments received from specified HMC customers to CDS, as required under the Agreement, tortiously interfered with the contractual relationships between CDS and those customers.  *See* Pl. Mem. at 8-9.  Applying the standards outlined above, and for the reasons set forth below, the Court respectfully recommends that Plaintiff's Motion be granted.

### A. **Breach of Contract Claim Against HMC**

#### 1. **Whether HMC Breached the Agreement**

Initially, CDS seeks summary judgment on its cause of action against HMC for breach of the Agreement, and contends that HMC has breached the Agreement when it: (1) "refused to repay the advances it borrowed from CDS"; and (2) "retained for itself and refused to remit customer payments that it is required to pay to CDS." Pl. Mem. at 4-9. Defendants counter that the Agreement is void because the Administrative Processing and Collateral Monitoring Fees are "disguised interest" and, once factored into the Agreement's interest calculation, yield a criminally usurious interest rate. *See* Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Mem."), DE [30], at 16-20.

The elements of breach of contract in New York are: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Martino v. MarineMax Northeast., LLC*, No. 17-cv-4708, 2018 WL 6199557, at *3 (E.D.N.Y. Nov. 28, 2018) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)); *see also Nedspice US Inc. v. Castella Imports, Inc.*, No. 20-cv-1802, 2020 WL 6785335, at *3 (E.D.N.Y. Oct. 22, 2020); *Arch Specialty Insurance Co. v. All Island Building & Restoration Inc.*, No. 19-cv-2396, 2020 WL 6321964, at *3 (May 2, 2020).

Applying these standards, the Court finds that, based on the evidence submitted, HMC breached the Agreement. Indeed, the parties do not dispute that: (1) both HMC and CDS were parties to the Agreement, *see* Pl. 56.1 ¶ 1; (2) HMC

borrowed $1,543,791.72 from CDS pursuant to the Agreement; *see id.* at ¶ 81; and (3) while HMC (either directly or through its customers) repaid CDS $1,027,634.77, between July 2018 and February 2019, HMC failed to "remit to CDS at least $553,819.05 in customer payments that were required to be paid to CDS" under the Agreement. and that, as of October 31, 2020, HMC had not repaid Plaintiff pursuant to the Agreement. *See id.* at ¶¶ 81-82. Accordingly, the Court finds that Plaintiff has sufficiently proven the elements of its breach of contract cause of action against HMC, and recommends that CDS be granted summary judgment on this claim.

## 2. Whether the Agreement's Interest Rate is Usurious

In reaching the above conclusion, the Court finds that: (1) despite HMC's assertions, the Administrative Processing Fee should not be treated as a component of interest under the Agreement; and (2) regardless of whether the Collateral Monitoring Fee is included in the interest rate calculation, the total amount of interest charged under the Agreement would not be criminally usurious.

In New York, a loan with an interest of at least 25% is considered criminally usurious. *See* N.Y. PENAL LAW § 190.40. Further, under New York's General Obligations Law, a court is required to declare a usurious loan void, and "enjoin any prosecution thereon, and order the same to be surrendered and cancelled." N.Y. GEN. OBLIG. LAW § 5-511; *Moss v. First Premier Bank*, No. 2:13-cv-05438, 2020 WL 5231320, at *4 (E.D.N.Y. Sept. 2, 2020) (quoting *Szerdahelyi v. Harris*, 67 N.Y.2d 42, 48, 499 N.Y.S.2d 650, 654 (1986)) ("[W]hen a court deems a transaction to be usurious, it must declare the transaction and its supporting documents void, enjoining

prosecution on them and order that all documents and collateral be cancelled and surrendered."); *Adar Bays, LLC v. GeneSYS ID, Inc.*, 962 F.3d 86, 88 (2d Cir. 2020) (finding that a contract that violated New York's civil usury statute is "void *ab initio*"); *Fareri v. Rain's International. Ltd.*, 187 A.D.2d 481, 482, 589 N.Y.S.2d 579, 580 (2d Dep't. 1992).

Usurious contracts relieve the borrower of the obligation to repay both principal and interest. *See Tinter v. Sack*, 230 A.D.2d 681, 682-83, 646 N.Y.S.2d 516, 518 (1st Dep't 1996) (finding a criminally usurious loan void and permitting borrower to bring action against lender for return of collateral); *Nikezic v. Balaz*, 184 A.D.2d 684, 685, 585 N.Y.S.2d 86, 87 (2d Dep't 1992) (complaint to recover on criminally usurious loan dismissed as against individual defendant because criminally usurious loan was void); *Fareri*, 187 A.D.2d at 482, 589 N.Y.S.2d at 580 (citing *Szerdahelyi*, 67 N.Y.2d at 48, 499 N.Y.S.2d at 654) (declaring loan void based upon an effective rate of interest of 26.14% because "when a court deems a transaction usurious, it must declare the transaction and its supporting documents void").

### i. Inclusion of the Administrative Processing Fee in the Interest Calculation

Applying the above standards, the Court finds HMC's arguments in favor of treating the Administrative Processing and Collateral Monitoring Fees as components of interest under the Agreement to be both legally and factually misplaced. As a matter of law, the Administrative Processing Fee cannot be treated as a component of interest under New York's usury law for two reasons: (i) HMC's failure to remit customer payments to CDS within three business days is considered

16

a default under the Agreement, and New York's usury laws do not apply to defaulted obligations, *see LG Capital Funding, LLC v. Positive ID Corp.*, No. 17-cv-1297, 2019 WL 3437973, at *11 (E.D.N.Y. July 29, 2019), *report and recommendation adopted*, 2019 WL 4564882 (E.D.N.Y. Sept. 20, 2019) (quoting *Adar Bays, LLC v. GeneSYS ID, Inc.*, 341 F. Supp. 3d 339, 341 (S.D.N.Y. 2018) ("The bulk of authority supports [the] contention that default payments are separate and distinct from the actual interest rate and therefore are not relevant in determining if the rate is usurious.")); *see also Blue Citi, LLC v. 5 Barz Int'l Inc.*, 338 F. Supp. 3d 326, 336 (S.D.N.Y. 2018) ("While the Second Circuit has not squarely ruled on the issue, the majority of district courts in this Circuit to have considered the issue have held that New York's usury laws do not apply to default interest rates."); *EMA Fin., LLC v. Joey New York, Inc.*, No. 17-cv-9706, 2019 WL 4600863, at *6 (S.D.N.Y. Sept. 22, 2019); *EMA Fin., LLC v. AIM Expl., Inc.*, No. 18-cv-145, 2019 WL 689237, at *10 (S.D.N.Y. Feb. 19, 2019)[4]; and (ii) whether HMC incurred any Administrative Processing Fee was a matter solely within HMC's control.  *See Salamone v. Russo*, 129 A.D.3d 879, 881, 15 N.Y.S.3d 344, 345-46 (2d Dep't 2015) (explaining that a default fee was not usurious because it was "based upon a contingency within the control of the debtor – in this case, default in the payment of an agreed-upon obligation – and the debtor could have avoided the imposition of such charges simply by paying promptly"); *KBM World Wide, Inc. v. Hangover Joe's Holding Corp.*, No. 15-cv-7254, 2017 WL 685606, at *4

---

[4] The Second Circuit has expressed, in a case dealing with civil usury, that New York's usury laws "do not apply to defaulted obligations[,]" *see Manfra, Tordella & Brookes, Inc. v. Bunge*, 794 F.2d 61, 63 n. 3 (2d Cir. 1986), and at least one Court within this District has agreed with that view. *See LG Capital Funding, LLC*, 2019 WL 3437973, at *11.

(E.D.N.Y. Feb. 1, 2017), *report and recommendation adopted*, 2017 WL 680418 (E.D.N.Y. Feb. 21, 2017); *Phlo Corp. v. Stevens*, No. 00-cv-3619, 2001 WL 1313387, at *5 (S.D.N.Y. Oct. 25, 2001), *aff'd*, 62 Fed. App'x 377 (2d Cir. 2003) (dismissing usury claim where loan "was not structured in such a way that [the lender] would necessarily receive more than the legal rate of interest"); *Feld v. Apple Bank for Sav.*, 116 A.D.3d 549, 553, 984 N.Y.S.2d 319, 323 (1st Dep't 2014) (dismissing borrower's cause of action usury based on a "contingency…within [the borrower]'s control").

Further, neither HMC nor Defendants' expert witness, Charles S. Lunden, have provided any evidence to dispute the fact that the Administrative Processing Fee was neither directly tied to HMC's outstanding loan balance, nor would have been incurred but for HMC's failure to remit payment received from customers to CDS, as required under the Agreement. *See generally* September 4, 2020 Expert Report on Interest Rates, prepared by Charles S. Lunden ("Lunden Rep.") (attached as Exhibit 5 to the Declaration of Eliot Kirshnitz ("Kirshnitz Decl."), DE [29-2]). Accordingly, the Court finds that it would be inappropriate for the Administrative Processing Fee to be treated as a component of interest under the Agreement.

### ii. Inclusion of the Collateral Monitoring Fee in the Interest Calculation

In addition to the above, the Court finds that, regardless of whether the Collateral Monitoring Fee is included in the interest rate calculation, the total amount of interest charged under the Agreement would have fallen below the criminally usurious rate of 25% per annum.

"Under New York law, a borrower may pay all reasonable expenses incurred by the lender in making the loan without rendering the loan usurious." *Durante Bros. & Sons v. Flushing Nat'l Bank*, 652 F. Supp. 101, 105 (E.D.N.Y. 1986). However, "when payments do not actually reimburse lenders for expenses associated with the loan[,] such fee expenses can be considered in determining the interest rate." *Hilliar Capital Invs., L.P. v. Integrated Freight Corp.*, 963 F. Supp. 2d 336, 339 (S.D.N.Y. 2013); *Union Capital LLC v. Vape Holdings Inc.,* No. 16-civ-1343, 2017 WL 1406278, at *7-9 (S.D.N.Y. Mar. 31, 2017) (holding same).

Applying the above, the Court finds that, regardless of whether the Collateral Management Fee is included in the interest calculation under the Agreement, the total amount of interest charged did not exceed 25%. While the parties disagree regarding the Collateral Monitoring Fee's purpose, *see* Pl. 56.1 ¶¶ 21-24; Def. 56.1 ¶¶ 21-24, they agree that it was a monthly fee "equal to 0.7% of the average outstanding balance for the prior thirty days." *See* Pl. 56.1 ¶ 21; Agreement § 2.9. The parties further agree that, if the Collateral Monitoring Fee were to be characterized as a component of interest and charged at 0.7% per month, with an annualized rate of 8.4%, HMC's total interest rate – inclusive of only the base interest rate and the Collateral Monitoring Fee – would never have exceeded 18.9% per year. *See* Pl. 56.1 ¶¶ 19, 24; Def. 56.1 ¶¶ 19, 24.

Moreover, the reports produced by both parties' expert witnesses buttress these calculations. Both experts agree with Lunden's analysis that, excluding the Administrative Processing Fee's from interest rate calculations yields an annual rate

well below 25%.  *See* Lunden Rep. at 7-8; October 5, 2020 Expert Rebuttal Report, prepared by Paul B. Hahn ("Hahn Rep.") (attached as Exhibit 6 to the Kirshnitz Decl.), ¶ 16.  Based on the evidence, the Court finds that, even if the Collateral Monitoring Fee were treated as a component of interest, the total amount of interest charged to HMC under the Agreement would have been below 25%, the threshold for criminal usury.  Accordingly, the Court recommends that CDS be granted summary judgment against HMC on this claim, due to HMC's breach of the Agreement, and inability to prove that the interest charged pursuant to the Agreement was criminally usurious.

### B. <u>Breach of Contract Claim Against DiPietro</u>

Plaintiff likewise seeks summary judgment against DiPietro for her alleged breach of the Guaranty.  *See* Pl. Mem. at 9-11.  Specifically, CDS asserts that it is entitled to summary judgment because it has "submitt[ed] proof of the existence of the underlying [contract], a guaranty executed by [DiPietro], and [DiPietro's] failure to make payment in accordance with the terms of the [contract] and guaranty."  Pl. Mem. at 10 (citing *Provident Bank v. Giannasca*, 55 A.D.3d 812, 812, 866 N.Y.S.2d 289, 289-90 (2d Dep't 2008)).

In New York, to demonstrate entitlement to summary judgment "on claims to recover damages by reason of a breach under the terms of a written guaranty," a plaintiff must establish "the existence of a primary obligation under a contract or note, the guarantee of such obligation by a guarantor and a default on the part of the obligor and the guarantor."  *RMP Capital, Corp. v. Victor Jet LLC*, No. 12-6197, 2013

WL 1822727, at *7 (N.Y. Sup. Ct. Apr. 12, 2013) (citing *Valley Natl. Bank v. INI Holding, LLC,* 95 A.D.3d 1108, 1109, 945 N.Y.S.2d 97, 98 (2d Dep't 2012); *see also Imperial Capital Bank v. 11-13-15 Old Fulton D, LLC,* 88 A.D.3d 652, 653, 930 N.Y.S.2d 267, 269 (2d Dep't 2011); *Urstadt Biddle Prop., Inc. v. Excelsior,* 65 A.D.3d 1135, 1136, 885 N.Y.S.2d 510, 511 (2d Dep't 2009); *Verela v. Citrus Lake Dev., Inc.,* 53 A.D.3d 574, 575, 862 N.Y.S.2d 96, 97-8 (2d Dep't 2008)).

"A loan institution may succeed on a summary judgment motion on a guaranty by proving the existence of the instrument and failure to pay." *Merrill Lynch Bus. Fin. Servs., Inc. v. Dia Supply Corp.*, No. 06-cv-5866, 2007 WL 9723268, at *4 (E.D.N.Y. Jun. 7, 2007); *see also Johnson & Johnson Finance Corp. v. BSR Realty L.P.*, No. 96-cv-0527, 1996 WL 546284, at *2 (E.D.N.Y. Sept. 19, 1996) (granting summary judgment to plaintiff lender who obtained written guarantees on the $2,000,000 loans from defendant guarantors); *Bank Leumi Trust Co. v. Meagher*, No. 93-cv-7351, 1994 WL 455106, at *1 (S.D.N.Y. Aug. 23, 1994) (requiring the lender to show: (1) defendant defaulted on its debts to lender, (2) defendants guaranteed and therefore may be held liable on the loans, and (3) the amount owed to lender went unpaid, in order to recover on a guaranty).

Applying the above standards, the Court finds that Plaintiff has submitted sufficient undisputed proof of: (1) the Agreement, which contains HMC's obligations to repay the advances paid by Plaintiff, as well as interest and applicable fees, *see* Pl. 56.1 ¶¶ 1, 6-32; (2) the Guaranty, wherein DiPietro "unconditionally and irrevocably guarantee[d] to [CDS] the prompt payment and performance" of HMC's obligations

under the Agreement, *id.* at ¶¶ 2, 33-36; and (3) HMC's failure to repay CDS pursuant to the terms of the Agreement and DiPietro's failure to make payments to Plaintiff, pursuant to the terms of the Guaranty. *See id.* at ¶ 80. *See JPMorgan Chase Bank v. Gamut-Mitchell, Inc.*, 27 A.D.3d 622, 622-23, 811 N.Y.S.2d 777, 777 (2d Dep't 2006) ("[P]laintiff made a prima facie showing of its entitlement to judgment as a matter of law by submitting proof of the underlying credit agreement, the guarantee bearing her signature, and the failure to make payment in accordance with the terms of the credit agreement and the guarantee."). Accordingly, the Court recommends that Plaintiff be granted summary judgment against DiPietro for her breach of the Guaranty.

## C. <u>Tortious Interference with Contractual Relations Claim</u>

CDS next seeks summary judgment against Defendants on its cause of action for tortious interference with contractual relations, arguing that Defendants' failure to deliver to CDS payments received by HMC, from customers who were obligated to deliver payment to CDS pursuant to individual Assignment Notices, tortiously interfered with the relationships between CDS and those customers. *See* Pl. Mem. at 8-9. Defendants do not dispute Plaintiff's factual assertions. *See generally* Def. Mem.

Under New York law, "[t]he tort of inducement of breach of contract, now more broadly known as interference with contractual relations, consists of four elements: [i] the existence of a contract between plaintiff and a third party; [ii] defendant's knowledge of the contract; [iii] defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and [iv] damages to plaintiff."

*LuxSoma LLc v. Leg Resource, Inc.*, 289 F. Supp. 3d 514, 523 (S.D.N.Y. 2018) (quoting *Kronos, Inc.* v. *AVX Corp.*, 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 934 (1993)); *see also Knopf v. Phillips*, 802 Fed. App'x 639, 641-42 (2d Cir. 2020) (citing *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 82 (1996)); *Lombard v. Booz–Allen & Hamilton, Inc.,* 280 F.3d 209, 214 (2d Cir. 2002). "While a defendant's commission of a 'crime or an independent tort' clearly constitutes wrongful means, such acts are not essential to find wrongful means." *Catskill Dev., LLC v. Park Place Ent. Corp*, 547 F.3d 115, 132 (2d Cir. 2008) (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189, 785 N.Y.S.2d 359, 361-62 (2004)).

Applying the above standards, the Court finds that Plaintiff has submitted sufficient evidence to warrant a recommendation of summary judgment against Defendants on CDS's cause of action for tortious interference with contractual relations.  Initially, Plaintiff has demonstrated that individual contracts were formed between CDS and each of HMC's customers that received an Assignment Notice from HMC and Plaintiff, informing each customer that HMC's receivables has been sold and assigned to CDS, and that "customers were to remit payment only to CDS."  *See* Pl. 56.1 ¶¶ 11-15; Borowski Decl. ¶ 8.  Plaintiff has proven that HMC knew about the Assignment Notices because each one was "executed by CDS and HMC on HMC's letterhead and instructed HMC's customers that "[t]his letter serves as [HMC's] irrevocable instructions to you and your irrevocable authority to pay the full amount of all existing and future invoices from HMC" directly to Plaintiff using the payment instructions set forth therein.  *See* Pl. 56.1 ¶ 12.  Moreover, HMC has admitted to

receiving, but not remitting to CDS, "at least $553,819.05 in customer payments that were required to be paid to CDS" under the Agreement, *see* Pl. 56.1 ¶¶ 62-72; Def. 56.1 ¶¶ 62-72, thereby causing its customers to breach their obligations to Plaintiff under each Assignment Notice, and CDS to sustain damages of over $500,000. Accordingly, the Court recommends that Plaintiff be granted summary judgment against Defendants on its tortious interference with contractual relations claim.

## IV.    CONCLUSION

For the reasons set for above, the Court respectfully recommends that Plaintiff's Motion be granted in its entirety.

## V.    OBJECTIONS

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below.   Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt of this report.   Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a); *Ferrer v. Woliver*, 05-cv-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:    Central Islip, New York
          May 18, 2021                    /s/ Steven I. Locke
                                          STEVEN I. LOCKE
                                          United States Magistrate Judge